## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LAMONT ZAMICHIELI,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 25-cv-1202** |
| | : | |
| **C/O DAV. GARNETT,** *et al.*, | : | |
| **Defendants.** | : | |

### MEMORANDUM

**Joseph F. Leeson, Jr.**                                                                    **November 3, 2025**
**United States District Judge**


In this civil action, Plaintiff Lamont Zamichieli, a convicted and sentenced prisoner, sued

employees of SCI Phoenix pursuant to 42 U.S.C. § 1983 claiming that he was subjected to

repeated instances of sexual abuse and excessive force while housed in the Intensive

Management Unit ("IMU"), and retaliated against for filing grievances and complaints.  (ECF

No. 1 ("Compl.").)  He also brings claims under state law for assault and battery.  Currently

before the Court is the Defendants' Motion to Partially Dismiss the Complaint, (ECF No. 27),

and Zamichieli's Opposition to that Motion, (ECF No. 29), in which he agrees to dismissal of

some claims, but opposes the dismissal of others.  As to the contested claims, the Court will

dismiss Zamichieli's due process claims but permit his remaining claims to proceed to discovery.

## I.    FACTUAL ALLEGATIONS[1]

Beginning in February 2022, Zamichieli was housed on the IMU on L-Block after being

placed on the Restricted Release List ("RRL") because of his history of repeated misconducts for

---

[1]        The following factual allegations are taken from the Complaint and documents attached
to the Complaint.  The Court adopts the sequential pagination supplied by the CM/ECF
docketing system.

indecent exposure and sexual harassment.  (Compl. at 10, ¶ 10; *see also id.* at 15, ¶ 27.)
Zamichieli also has a history since 2016 or 2017, of alleging sexual abuse by female prison staff
and filing related complaints in accordance with the Prison Rape Elimination Act ("PREA").
(*Id.* at 11, ¶ 15.)  Because of this history, Zamichieli's DOC records reflect that he is "to be seen
by male staff only in regard to any issue within prison."  (*Id.* at 11, ¶ 16.)

      Zamichieli's claims in the instant civil action are based on events that occurred on the
IMU beginning in June of 2024.  He names as Defendants four IMU officers—C/O Dav. Garnett,
C/O Isabel Medina, Lt. Nyce, and Lt. Patterson (also the "PREA Lieutenant")—as well as Sean
Grady, Unit Manager of the IMU; E. Hodrick, Captain on the IMU (also Medina's fiancé);
Hensley J. Muick, Deputy Superintendent and PREA compliance manager on the IMU; J. Yodis,
a hearing examiner; and Superintendent Joseph Terra.  (*Id.* at 2-8.)  Zamichieli alleges that his
history and restrictions are well known to prison officials, including staff who work on the IMU,
and that he regularly reminded the Defendants of his susceptibility to sexual and physical abuse
by female staff members.  (*Id.* at 11, ¶ 17.)

      On or about June 20, 2024, prison administrators, including Superintendent Terra and
Captain Hodrick, assigned Isabel Medina, a female officer, to A-Pod on the IMU, where
Zamichieli was housed.  (*Id.* at 10, ¶¶ 12-13.)  Medina allegedly told Zamichieli that she knew
why he was housed on the IMU and "could use his history against him to make him comply with
her own sexual demands/needs."  (*Id.* at 13, ¶ 20.)  At some point thereafter and on repeated
occasions, Medina allegedly threatened Zamichieli with sexual and physical assault, false
misconducts, and criminal charges to encourage him to expose himself to her.  (*Id.* at 12, ¶ 18;
*see also id.* at 20-21, ¶ 45.)  She also allegedly threatened that Garnett would abuse him, (*id.*),

and, along with Garnett, subjected him to sexual abuse on several occasions, (*id.* at 14, ¶ 24; *see also id.* at 25, ¶ 54; *id.* at 26-27, ¶¶ 56(B)-(C)).

On July 3, 2024, Zamichieli filed a "PREA grievance" against Medina and Garnett about an incident that occurred the day prior, as well as a grievance against Medina for smoking an e-cigarette on the unit and seeking payment from prisoners in exchange for bringing them contraband. (*Id.* at 12, ¶ 19; *see also id.* at 16, ¶ 28.) On the same day, Garnett allegedly "dragged Zamichieli out of [a] yard cage by the handcuffs," slammed him against the ground and bars of the cage, and punched, kicked, and elbowed him.[2] (*Id.* at 17, ¶ 35.) Nyce was present during this use of force, but did not document or record the incident and, along with Garnett, failed to seek medical attention for Zamichieli thereafter.[3] (*Id.* at 18, ¶¶ 37-38.) Garnett then "wrote a false misconduct" accusing Zamichieli of assault to justify his use of force and retaliate against Zamichieli for filing the PREA complaint. (*Id.*) At a hearing on the disciplinary charges, Yodis allegedly prevented Zamichieli from calling two inmate witnesses to testify that Garnett was lying, found Zamichieli guilty, and sanctioned him with thirty days of disciplinary confinement, resulting in a "loss of prison job and longer stay in level 5 housing unit solitary confinement," which Zamichieli claims exacerbated his mental condition. (*Id.* at 18, ¶ 38; *id.* at

---

[2]    Zamichieli also alleges that he was strip searched before he was taken to the yard. (Compl. at 17-18, ¶ 36.) In response to the Defendants' Motion to Dismiss, he confirmed that he is not bringing any claims based on this strip search. (ECF No. 29 at 2 ("It's also agreed that Plaintiff is not alleging 8th Amendment claims against Defendant Garnett arising from a . . . strip search.").)

[3]    Zamichieli also alleges that, prior to the use of force, he told Nyce how Garnett threatened to use violence against him, and Nyce responded that he should "stop snitching." (Compl. at 17-18, ¶ 36.) In his response to the Defendants' Motion, Zamichieli confirms that he is not bringing any claims against Nyce based on the allegation that Nyce told him to "stop snitching." (ECF No. 29 at 2.)

31.)  Additionally, Garnett and Medina allegedly told other inmates that they should attack Zamichieli because he is a "snitch," "rat," and sex offender.  (*Id.* at 19, ¶¶ 40-42.)

The July 3 grievance was one among many that Zamichieli filed about his interactions with Medina and Garnett.  (*Id.* at 13, ¶ 21; *see also id.* at 14, ¶ 23.)  These grievances were forwarded to the security department and reviewed by Defendants Grady, Terra, Hodrick and Patterson, who allegedly ignored them instead of investigating, did not follow DOC protocol, and did not take action to correct the ongoing situation.  (*Id.* at 12, ¶ 18; *see also id.* at 13, ¶ 21; *id.* at 16, ¶ 29; *id.* at 19, ¶ 39; *id.* at 20, ¶ 43.)  When Zamichieli attempted to address Medina's threats with these Defendants verbally, they allegedly responded that he should "suck it up and deal with it" and claimed that he liked to expose himself so he should enjoy the interactions.[4] (*Id.* at 13, ¶ 21.)  They also refused to reassign Medina, contrary to DOC policy, so she continued to work on the same block where Zamichieli was housed, which gave her the opportunity to retaliate against him.  (*Id.* at 14, ¶ 23; *see also id.* at 15, ¶ 25; *id.* at 17, ¶ 32.)

The alleged sexual abuse continued.  Zamichieli alleges that Medina wrote a false misconduct against him on August 3, 2024, claiming that he exposed himself to her, refused to obey an order, and threatened to rape her even though, according to Zamichieli, she was the aggressor who raped him on that date.  (*Id.* at 21-22, ¶¶ 46-47.)  Zamichieli was ultimately found not guilty of the misconduct charges associated with the August 3 incident.  (*Id.* at 21-22, ¶¶ 47-48.)  The next day, August 4, Medina falsely accused Zamichieli of throwing urine on her and threatening her.  (*Id.* at 22, ¶¶ 49-50; *see id.* at 10, ¶ 13.)  Zamichieli claims that Yodis

---

[4]     Zamichieli alleges that Medina's actions and staff's responses to his grievances were prompted by Terra's directive to staff to treat Zamichieli in this manner for the purpose of retaliating against him for filing a lawsuit against Terra's relative.  (*See, e.g.*, Compl. at 14, ¶ 23.) In response to the Defendants' Motion to Dismiss, Zamichieli has agreed to drop this retaliation claim.  (ECF No. 29 at 2.)

wrongfully found him guilty of the August 4 misconduct charges (which were rewritten on August 8), despite holding the hearing outside the time frame called for by the DOC's procedural guidelines, and sanctioned him with ninety days in solitary confinement.  (*Id.* at 7-8, ¶ 8; *id.* at 23, ¶ 52; *id.* at 32.)  Zamichieli claims that Yodis handled the misconduct proceedings in this manner to pave the way for the filing of criminal charges against him based on the incident, which he claims are false.  (*Id.* at 22-24, 32); *see Commonwealth v. Zamichieli*, No. CP-46-CR-0006721-2024 (C.P. Montgomery).

Public dockets confirm that on August 12, 2024, Zamichieli was criminally charged with aggravated harassment by a prisoner, terroristic threats with intent to terrorize another, and disorderly conduct engage in fighting.  *Zamichieli*, No. CP-46-CR-0006721-2024.  He alleges that these charges were based on the same August 3 and August 4 incidents underlying Medina's false misconduct charges.  (Compl. at 26, ¶ 56.)  On July 2, 2025, Zamichieli pled guilty to aggravated harassment by a prisoner and was sentenced to ten to twenty months of incarceration; the remaining charges were nolle prossed on that date.  *Zamichieli*, No. CP-46-CR-0006721-2024.  Zamichieli alleges that Medina remained assigned to his block while the charges were pending, allowing her to tease him about the criminal case and threaten him with additional "false criminal charges."  (Compl. at 11, ¶ 13; *see also id.* at 22, ¶ 50.)  Zamichieli contends that he "did not commit aggravated harassment by a prisoner" and that camera footage and tests of Medina's clothing would confirm that he did not throw, toss, or spit any bodily fluids at her.  (*Id.* at 23-25, ¶¶ 51-53.)  While the charges were pending, Zamichieli claims he was raped and/or sexually assaulted three times by Garnett in September and November 2024, and that the September incident was substantiated after Zamichieli filed a grievance.  (*Id.* at 25-27, ¶¶ 54-56(c); *see also* ECF No. 2 at 4.)

Based on the above allegations, Zamichieli brings Eighth Amendment claims for excessive force, sexual abuse, and deliberate indifference against all Defendants; First Amendment retaliation claims against all Defendants; and Due Process claims against Defendants Terra, Medina, Yodis, and Garnett based on the false misconduct reports and false criminal charges.  (Compl. at 28-32, ¶¶ 60-62.)  He also brings assault and battery claims against all Defendants under Pennsylvania law.  (*Id.* at 28, ¶ 59.)  Zamichieli seeks damages and assorted injunctive relief.[5]  (*Id.* at 34, ¶ 68.)

The Defendants moved to dismiss the Complaint in part, arguing that certain of Zamichieli's claims are legally defective.  (ECF No. 27.)  Zamichieli filed a response, conceding certain points, *see supra* nn. 2-4, and challenging others.  (ECF No. 29.)  Below, the Court will address the contested issues raised by the motion.

## II.  STANDARD OF REVIEW

The Defendants seek to partially dismiss Zamichieli's Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  "A 12(b)(6) motion tests the sufficiency of the allegations contained in the complaint."  *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  In deciding a motion to dismiss under Rule 12(b)(6), the Court must determine

---

[5]    Zamichieli was incarcerated at SCI Phoenix at the time he filed this lawsuit but has since been transferred to SCI Houtzdale.  The transfer moots Zamichieli's requests for injunctive relief as to his conditions claims, especially his request for a transfer and separation from the Defendants who are employed at SCI Phoenix. *See, e.g.*, *Griffin v. Beard*, 401 F. App'x 715, 716 (3d Cir. 2010) (*per curiam*) ("An inmate's transfer from the facility complained of generally moots the equitable and declaratory claims." (quoting *Sutton v. Rasheed*, 323 F.3d 236, 248 (3d Cir. 2003)).  To the extent Zamichieli sought intervention in his then pending criminal case or now seeks vacatur of his conviction, such relief is not appropriate in a civil rights action.  *See Garrett v. Murphy*, 17 F.4th 419, 430 (3d Cir. 2021) ("[W]henever a plaintiff pleads a violation of § 1983 and effectively seeks habeas relief, the plaintiff fails to state a § 1983 claim.  Instead, the prisoner's only federal remedy is through a writ of habeas corpus after exhausting state remedies.").

whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) ("Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." (internal quotation marks and citations omitted)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. In determining whether a complaint states a plausible claim, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). The Court affords a liberal construction to factual allegations when a complaint is filed by a self-represented litigant. *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021). Additionally, the Court may, on its own authority, dismiss implausible claims filed by a prisoner against government officials or challenging the constitutionality of prison conditions. *See* 28 U.S.C. § 1915A; 42 U.S.C. § 1997e(c)(1); *see also Grayson v. Mayview State Hosp.*, 293 F.3d 103, 109-10 (3d Cir. 2002); *see also Beenick v. LeFebvre*, 684 F. App'x 200, 204 (3d Cir. 2017).

III.    **DISCUSSION**

   **A.  Section 1983 Claims**

      **1.   Due Process Claims**

Zamichieli alleges that Defendants Terra, Medina, Yodis and Garnett violated his right to procedural due process by "filing and or conducting hearings on the false misconduct reports and initiating false criminal charges" against him.  (Compl. at 30-31, ¶ 62.)  These claims are predicated on the disciplinary sanctions imposed on Zamichieli after he was found guilty of the misconduct charges filed against him by Garnett and Medina, respectively, for incidents that occurred on July 3 and August 4, as well as the allegedly false criminal proceedings predicated on the August 3 and August 4 incidents involving Medina.  (*Id.* (describing the factual basis for Zamichieli's due process claims).)

         **a.   July Misconduct**

The Defendants argue that Zamichieli has not stated a due process claim against Yodis and Garnett based on the July 3 misconduct because a false misconduct alone is an insufficient basis for a claim and Zamichieli did not sufficiently allege that he was unable to defend himself due to an alleged inability to call witnesses at the disciplinary hearing.  (ECF No. 27 at 12-13.) Zamichieli did not respond to the Defendants' arguments for the dismissal of his due process claims based on the July misconduct.

In the prison context, "[d]ue process protection for a state created liberty interest is . . . limited to those situations where deprivation of that interest 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'"  *Griffin v. Vaughn*, 112 F.3d 703, 706 (3d Cir. 1997) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).  This is a high standard rarely met by "confinement in administrative or punitive segregation."  *Smith v.*

*Mensinger*, 293 F.3d 641, 653 (3d Cir. 2002); *see also Burns v. PA Dep't of Corr.*, 642 F.3d 163,

171 (3d Cir. 2011) ("[I]nmates are generally not entitled to procedural due process in prison

disciplinary hearings because the sanctions resulting from those hearings do not usually affect a

protected liberty interest.").  To determine whether conditions are atypical and significant for

purposes of establishing a liberty interest, a court must consider "(1) the duration of the

challenged conditions; and (2) whether the conditions overall imposed a significant hardship in

relation to the ordinary incidents of prison life." *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d

549, 560 (3d Cir. 2017).  Absent such a protectable interest, a false misconduct or alleged

procedural inadequacies in a disciplinary hearing do not state a due process claim.[6]  *Smith*, 293

F.3d at 653-54 (concluding that an allegation of false misconducts does not state a due process

claim); *see also Williams v. Bitner*, 307 F. App'x 609, 611 (3d Cir. 2009) (*per curiam*) ("The

lack of representation and inability to call witnesses, as well as any other alleged procedural

defects, lack legal significance in the absence of any protectable interest."); *Seville v. Martinez*,

130 F. App'x 549, 551 (3d Cir. 2005) (*per curiam*) ("With respect to Seville's claim that his due

process rights were violated, the filing of a fraudulent misconduct report and related disciplinary

sanctions do not without more violate due process.").

 Zamichieli's due process claims based on the July 3 misconduct fail because he has not

alleged a protectable legal interest.  Following a hearing on the allegedly false misconduct

charge, he was sanctioned to thirty days of disciplinary confinement, lost his prison job, and was

subjected to an unspecified "longer stay in level 5 housing unit solitary confinement" on the

IMU.  (Compl. at 31.)  Although prolonged periods of indefinite solitary confinement can be

---

[6] To the contrary, the filing of false misconduct reports in retaliation for a prisoner's
exercise of a constitutional right violates the constitution even in the absence of a liberty interest.
*Smith*, 293 F.3d at 653.

sufficient to trigger a due process interest, *Williams*, 848 F.3d at 574-75 (recognizing "a due

process right to be free from indefinite conditions of solitary confinement"); *Shoats v. Horn*, 213

F.3d 140, 144 (3d Cir. 2000) (holding that eight years in administrative custody in solitary

confinement was atypical and significant), allegations similar to Zamichieli's have been found

insufficient, *see Wilkerson v. Goodwin*, 774 F.3d 845, 855 (5th Cir. 2014) ("[T]he duration in

segregated confinement that courts have found does not give rise to a liberty interest ranges up to

two and one-half years."); *Fraise v. Terhune*, 283 F.3d 506, 522-23 (3d Cir. 2002) ("Although

inmates who are transferred to the STGMU [Security Threat Group Management Unit] face

additional restrictions, we hold that the transfer to the STGMU does not impose an atypical and

significant hardship in relation to the ordinary incidents of prison life."); *Griffin*, 112 F.3d at 708

(holding that "exposure to the conditions of administrative custody for periods as long as 15

months falls within the expected parameters of the sentence imposed [. . .] by a court of law" and

does not constitute a due process violation (quotation omitted)); *see also Miller v. Metzger*, No.

21-2223, 2022 WL 4820322, at *2 (3d Cir. Oct. 3, 2022) (*per curiam*) ("Miller's sanctions,

which involved five days in isolation, ten days confined to quarters, thirty days without

privileges, and a year in the Security Housing Unit, were insufficient to trigger due process

protections."); *Jones v. Davidson*, 666 F. App'x 143, 147 n.2 (3d Cir. 2016) (*per curiam*)

(finding no liberty interest where, "as a result of the misconduct charge, [plaintiff] was placed in

the Restricted Housing Unit (RHU) for thirty days, designated a predator, ostracized and

stigmatized, and assigned a higher security status, which affects his housing, work eligibility,

and school and program consideration."); *Perry v. Lackawanna Cnty. Child. & Youth Servs.*, 345

F. App'x 723, 726 (3d Cir. 2009) (*per curiam*) ("Perry alleged that, as a result of the disciplinary

proceedings, he was sanctioned to 30 days of solitary confinement, 60 days without visiting

privileges, and loss of his institutional employment. These sanctions do not qualify as an 'atypical or significant hardship' under *Sandin*."); *Toussaint v. Good*, 276 F. App'x 122, 124 (3d Cir. 2008) (*per curiam*) ("[T]o the extent that Toussaint's claim is based on 'false' misconducts that resulted in sixty-and ninety-day stays in the RHU, such stays do not constitute an 'atypical and significant hardship' to trigger due process protections.").  Accordingly, the Court will dismiss Zamichieli's due process claims based on the July 3 misconduct with prejudice.[7]

### b.  August Misconduct and Criminal Proceeding

The Defendants also move to dismiss "[a]ny claims by Zamichieli arising out of [the] August 4, 2024 incident," following which Medina accused Zamichieli of throwing urine or another liquid on her, pursuant to "the *Heck* doctrine." (ECF No. 27 at 13-14.)  That doctrine precludes a plaintiff from proceeding on claims "for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid" unless he or she "prove[s] that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus[.]"  *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994) (footnote and citation omitted); *see also Wilkinson v. Dotson*, 544 U.S. 74, 81-82 (2005) ("[A] state prisoner's § 1983 action is barred (absent prior invalidation) — no matter the relief sought (damages or equitable relief) . . . — if success in that action would necessarily demonstrate the invalidity of confinement or its duration." (emphasis omitted)).  Since Zamichieli pleaded guilty to aggravated

---

[7]    Because the claim fails as a matter of law, leave to amend would be futile.  *See Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004) (holding that a court may deny leave to amend if a complaint is vulnerable to 12(b)(6) dismissal, if an "amendment would be inequitable or futile").

harassment by a prisoner in connection with the August 4 incident, *see Zamichieli*, CP-46-CR-0006721-2024, the Defendants are correct that *Heck* precludes him from arguing that the criminal charge or Medina's related misconduct (which was based on the same behavior), were "false" because he "did not commit aggravated harassment by a prisoner" by throwing urine or other fluids at her, (*see* Compl. at 23-25, ¶¶ 51-53).  Allowing Zamichieli to proceed on these claims would necessarily imply the invalidity of his intact conviction.  Accordingly, the Court will dismiss these claims without prejudice to Zamichieli's ability to reassert them in the event his conviction is ever invalidated.  *See Garrett*, 17 F.4th at 429 ("*Heck* is clear that the favorable-termination requirement is a necessary element of the claim for relief under § 1983."); *Curry v. Yachera*, 835 F.3d 373, 379 (3d Cir. 2016) (*Heck*-barred claims must be dismissed without prejudice).

Notably, Zamichieli did not respond to the Defendants' *Heck* argument.  He acknowledges that he "pled guilty to aggravated harassment for [the August 4] incident," but notes that he did not plead guilty to the remaining charges, which were dismissed and which he alleges were based on the August 3 incident.  (ECF No. 29 at 2, 14.)  Although *Heck* would not bar claims challenging the falsity of criminal charges for which no conviction was obtained, Zamichieli has nevertheless failed to state a claim based on his prosecution.

Allegations that a plaintiff has been falsely charged in a criminal proceeding are best construed as a malicious prosecution claim.  *See Holley v. Dep't of Veteran Affairs*, 165 F.3d 244, 248 (3d Cir. 1999) ("We apply the applicable law, irrespective of whether a *pro se* litigant has mentioned it by name."); *see generally Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 367 (2017) ("If the complaint is that a form of legal process resulted in pretrial detention unsupported by probable cause, then the right allegedly infringed lies in the Fourth Amendment."); *Betts v.*

*New Castle Youth Dev. Ctr.*, 621 F.3d 249, 260 (3d Cir. 2010) (discussing the "more-specific-provision rule"). A plaintiff asserting a constitutional malicious prosecution claim must establish that "(1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *McKenna v. City of Philadelphia*, 582 F.3d 447, 461 (3d Cir. 2009). Since Zamichieli was already incarcerated in connection with another sentence at the time he was charged and at the time charges based on the August 3 incident were dismissed, the allegedly false charges did not cause him to suffer a deprivation of liberty, which is fatal to his claim.[8] *See Curry*, 835 F.3d at 380 ("When McClure's charges were dropped, Curry was still in jail. As a result, McClure never deprived Curry of his liberty 'as a consequence of' the charges McClure brought against Curry. Curry's liberty had already been deprived."); *see also Gray v. Wittman*, 839 F. App'x 669, 671 (3d Cir. 2021) (*per curiam*) (affirming dismissal of malicious prosecution claims where plaintiff "suffered no deprivation of liberty; he was already incarcerated and would have been detained on the other counts of conviction in any event").

In sum, the Court cannot discern any basis for a due process claim against the Defendants. Accordingly, the Defendants' Motion to dismiss the due process claims will be granted and Zamichieli's due process claims will be dismissed.[9]

---

[8]  Even assuming the Due Process Clause provides a basis for a claim here, Zamichieli does not allege that he did not receive adequate process in the state prosecution.

[9]  To the extent the Complaint can be understood to raise additional due process claims not discussed here, they are implausible and will also be dismissed. Leave to amend these additional claims, as well as the claims arising from the August 3 incident, would be futile so the dismissal is with prejudice. *See Alston*, 363 F.3d at 235.

### 2. Personal Involvement in Eighth Amendment and Retaliation Claims

Zamichieli also asserts Eighth Amendment claims for excessive force, sexual abuse, and deliberate indifference, as well as First Amendment claims that he was retaliated against for filing grievances and PREA complaints about the abuse he allegedly experienced.[10]  The Eighth Amendment prohibits prison officials from unnecessarily and wantonly inflicting pain in a manner that offends contemporary standards of decency.  *See Hudson v. McMillian*, 503 U.S. 1, 8-9 (1992).  "Force that is used 'maliciously and sadistically for the very purpose of causing harm' violates the Eighth Amendment."  *Young v. Martin*, 801 F.3d 172, 180 (3d Cir. 2015) (quoting *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)).  Sexual abuse likewise violates a prisoner's Eighth Amendment rights where the abuse is "objectively sufficiently serious," and the defendants acted "maliciously and sadistically for the very purpose of causing harm."  *Ricks v. Shover*, 891 F.3d 468, 473-75 (3d Cir. 2018) (internal quotations omitted).  Additionally, the Eighth Amendment is violated when prison officials act with deliberate indifference to a serious risk that a prisoner will suffer harm, meaning they must know of and disregard an excessive risk to the prisoner's safety.  *See Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994) (internal quotation and citation omitted); *Beers-Capitol v. Whetzel*, 256 F.3d 120, 135 (3d Cir. 2001).  Repeatedly calling a prisoner a "snitch" meets this standard when the prisoner is put at risk of assault from others.  *See Moore v. Mann*, 823 F. App'x 92, 94 (3d Cir. 2020) (*per curiam*) (vacating grant of summary judgment on claims that "corrections defendants allegedly began making inflammatory statements about Moore, calling him a pedophile, gay, and a snitch" creating a risk that Moore would be assaulted and causing Moore to be assaulted); *Jackson v. O'Brien*, No. 18-00032, 2021

---

[10]    As noted above, Zamichieli agrees that he did not state a retaliation claim based on his filing of a lawsuit against Terra's relative.  *See supra* n.4.

WL 3174687, at *4 (W.D. Pa. July 27, 2021) ("Being labeled a 'snitch' or a 'rat' can be a dangerous designation in prison.").  To state a plausible First Amendment retaliation claim, a prisoner must allege that: (1) he engaged in constitutionally protected conduct, which includes filing grievances; (2) he suffered an adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) the constitutionally protected conduct was "a substantial or motivating factor" for the adverse action.  *See Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001); *see also Watson v. Rozum*, 834 F.3d 417, 422-23 (3d Cir. 2016).

Zamichieli primarily brings these claims against Medina and Garnett and he is correct that the Defendants did not move to dismiss his Eighth Amendment or remaining retaliation claims against those Defendants.  (ECF No. 29 at 1.)  Rather, the Defendants argue that Zamichieli failed to adequately allege the personal involvement of Defendants Patterson, Hensley, Terra, Hodrick, Nyce, Muick and Grady in these constitutional violations either on a failure to train or discipline theory, or a direct involvement theory.  (ECF No. 27 at 8-9.) Zamichieli responds that Defendants Patterson, Hensley, Terra, Hodrick, Nyce, Muick and Grady were "deliberate[ly] indifferent to the substantial well-documented risk of harm [he] faced and risk posed having female staff assigned to the unit despite knowing and being well aware through written and oral complaints of ongoing risk and abuse" that had been "well-documented" since 2017, establishing that Zamichieli had been sexually abused by female staff in the past.  (ECF No. 29 at 3.)  His response does not address liability on a failure-to-train or failure-to-discipline theory.

To state a § 1983 claim, a plaintiff must allege how each defendant was personally involved in the events and occurrences giving rise to the claims brought against that defendant. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998).  In other words, "'[e]ach

Government official, his or her title notwithstanding, is only liable for his or her *own* misconduct.'" *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 290 (3d Cir. 2018) (quoting *Iqbal*, 556 U.S. at 677) (emphasis in original). "Suits against high-level government officials must satisfy the general requirements for supervisory liability." *Wharton v. Danberg*, 854 F.3d 234, 243 (3d Cir. 2017). There are "two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 575 U.S. 822 (2015). First, a supervisor may be liable if he or she "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *Id.* (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original)).

A supervisor may also "be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct." *Id.* "Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." *Rode*, 845 F.2d at 1207; *see also Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020). "Although a court can infer that a defendant had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a case, the knowledge must be actual, not constructive." *Chavarriaga v. New Jersey Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015). "[T]he level of intent necessary to establish supervisory liability will vary with the underlying constitutional tort alleged." *Barkes*, 766 F.3d at 319.

The Court understands the Complaint to assert two theories of supervisory liability, the first on the basis that Defendant Patterson, Hensley, Terra, Hodrick, Nyce, Muick and Grady

failed to train or discipline their subordinates, and the second based on allegations that these Defendants directly participated in the underlying constitutional violations committed by Medina and Garnett through their own acts and their knowledge of and acquiescence to ongoing physical and sexual assault and retaliation on the IMU.  As to the first theory, Zamichieli alleges that Patterson, the PREA Lieutenant, "intentionally failed to properly investigate, discipline and train the officers that she is responsible for."  (Compl. at 5, ¶ 5.)  He further alleges that "Patterson, Hensley[,] J. Muick, Grady, Nyce, Hodrick, Joseph Terra, and other defendants who are supervisors" of Garnett and Medina failed to train them on the "use of force policy" and "failed to discipline" them for "obvious abuse caught on available camera footage."  (Compl. at 19 ¶ 39.)  Zamichieli's allegation against Patterson falls short of the pleading standard, as it is conclusory and fails to provide sufficient context to understand what training, as the "PREA Lieutenant," Zamichieli believes she was responsible for providing or should have provided. Zamichieli's broader allegation also falls short of stating a failure to train or discipline claim as it mostly parrots the standard for supervisory liability.  In sum, the Complaint does not develop a sufficient factual basis for proceeding on these theories of liability.  *See Jankowski v. Lellock*, 649 F. App'x 184, 188 (3d Cir. 2016) (affirming dismissal of failure-to-train claim "relegated to a single sentence in the complaint" as "merely a rote recitation of a cause of action coupled with a legal conclusion" that was insufficient to satisfy the pleading standard); *Owens v. Coleman*, 629 F. App'x 163, 167 (3d Cir. 2015) (*per curiam*) (affirming dismissal of failure-to-train claim: "Not only does [the complaint] not describe the nature of Appellees' training program, it fails to point to specific deficiencies in the program, or explain how those deficiencies caused [plaintiff's] injuries"); *see generally Santiago v. Warminster Twp.*, 629 F.3d 121, 132 (3d Cir.

2010) (explaining that "mere restatements of the elements of [a plaintiff's] supervisory liability claims . . . are not entitled to the assumption of truth").

Zamichieli's allegations are far more specific as to his second theory of supervisory liability. Lieutenants Patterson and Nyce, Captain Hodrick, Unit Manager Grady, and Deputy Superintendents/PREA Compliance Managers Hensley and Muick are all alleged to have worked on the IMU where the alleged abuse occurred. Zamichieli alleges that he has a long history of sexual abuse by female prison staff dating back to 2016 or 2017, that this history was the reason for his placement on the IMU during the relevant events, that his file contained a note in his "Problems List" that he was to be seen by male staff only because of this history, and that the Defendants, as employees on this unit, were well aware of this problem through his records. (Compl. at 11-12, ¶¶ 15-18.) Zamichieli also alleges that he regularly notified and/or spoke with these Defendants specifically about Medina and Garnett's conduct—but that they generally responded by telling him not to be a snitch and saying that he likes exposing himself—and that they were also aware of Garnett and Medina's conduct through many grievances and PREA complaints that he filed. (*See, e.g.*, *id.* at 13, ¶ 21.)

A supervisory defendant's knowledge of grievances, or failure to respond to grievances or investigate an inmate's allegations of misconduct, is often insufficient to establish that defendant's personal involvement in the underlying wrongs. *See, e.g.*, *Dooley*, 957 F.3d at 374 (inmate failed to establish personal involvement based on evidence that he sent the secretary of DOC "a copy of documents reflecting his GBMI verdict and request for D Code designation" coupled with the secretary's lack of response or action, and based on other defendants' review and denial of grievances); *see also Higgs v. New Jersey Dep't of Corr.*, No. 24-1712, 2024 WL 3811985, at *2 (3d Cir. Aug. 14, 2024) (*per curiam*) ("The mere investigation or adjudication of

a grievance is insufficient to implicate an officer in the underlying injury, as it does not

demonstrate 'personal knowledge' or violate a constitutional right for the purposes of § 1983.").

However, the pleading standard is satisfied where allegations of a supervisory defendant's

involvement in the grievance or investigatory process are coupled with allegations of that

defendant's direct involvement or knowledge and acquiescence of an ongoing pattern of

misconduct in a manner that supports an inference that the supervisor acted with the requisite

mindset for liability to attach.  *See Beers-Capitol*, 256 F.3d at 134 ("[O]ne way—perhaps the

easiest way—a plaintiff can make out a supervisor liability claim is by showing that 'the

supervisory official failed to respond appropriately in the face of an awareness of a pattern of

such injuries.'" (quoting *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)); *Bowers v.

Lensbower*, No. 23-00030, 2025 WL 2645893, at *9 (M.D. Pa. Sept. 15, 2025) (explaining that

"the Third Circuit has, under certain, limited circumstances, determined that a supervisory

official's response to a grievance may be sufficient to show that official's personal involvement

in the plaintiff's asserted constitutional claims" and citing cases).  Given the severity and

frequency of the alleged abuse—Zamichieli alleges that Medina and Garnett coerced him into

exposing himself on over one-hundred occasions between June 20 and August 2, 2024, and was

subsequently raped (Compl. at 8-9, ¶ 4; *id.* at 25, ¶ 54; *id.* at 27, ¶ 56(c))—and Zamichieli's

allegations that he complained directly to these Defendants, all of whom are alleged to play a

role in the management of the unit including handling of PREA matters, it is plausible to infer

that they had knowledge of continuous physical and sexual abuse on the unit yet intentionally

made staffing or investigative decisions that would expose Zamichieli to a risk of further harm.

Indeed, Zamichieli alleges that those Defendants responsible for investigating his PREA

complaints failed to follow internal policy that required him to be separated from the alleged

abuser, and that Unit Manager Grady, after speaking with "Capt. Hodrick/ shift commanders and Spt. Terra," informed Zamichieli that they would not reassign Medina, which reflects their direct involvement in the decision to keep Medina assigned to the unit.  (Compl. at 13, ¶ 22; *id.* at 15, ¶ 25.); *Curtis v. Wetzel*, 763 F. App'x 259, 263 (3d Cir. 2019) (*per curiam*) ("In light of this statement from a prison official that Defendants Wetzel and Klopotoski issued a written order to Curtis, we conclude that the District Court erred in granting a motion to dismiss on the ground that those defendants had no apparent personal involvement."); *see also E. D. v. Sharkey*, 928 F.3d 299, 309 (3d Cir. 2019) (holding that knowledge of obvious ongoing sexual relationship between detainee and officer and failure of co-workers or supervisor to take steps to protect detainee supported their own involvement in the constitutional violation); *Snider v. Pennsylvania DOC*, 505 F. Supp. 3d 360, 429-30 (M.D. Pa. 2020) ("We do not read Mr. Snider's claims against these individuals to be based on the grievance process. We read his claims as pleading these individuals had knowledge of abuse against Mr. Snider . . . and did nothing to cure it. Mr. Snider alleges their actual knowledge through his written and verbal communications complaining of conditions of solitary confinement.").  Further, Nyce is alleged to have done nothing while observing Garnett attack Zamichieli in the yard, which on its own may be sufficient to allege an Eighth Amendment violation.  *Smith*, 293 F.3d at 650 (an official displays deliberate indifference if, when an attack occurs, he has "a realistic and reasonable opportunity to intervene" but "simply refuse[s] to do so").

In sum, at this early stage of the litigation, reading the Complaint as a whole and taking all inferences in favor of Zamichieli, as the Court is required to do, he has adequately alleged the personal involvement of Patterson, Hensley, Terra, Hodrick, Nyce, Muick and Grady in the

constitutional violations at issue.  Accordingly, the Court will deny the Defendants' motion to dismiss these claims.

**B.  State Law Claims**

The Defendants also move for dismissal of Zamichieli's state tort claims against Defendants Terra, Grady, Patterson, Hensley, Hodrick, Muick, Yodis, and Nyce on sovereign immunity grounds.  (ECF No. 27 at 6-7.)  These claims are based on Zamichieli's allegations that the moving Defendants "knowingly condon[ed] and aid[ed] and [a]bett[ed]/cover[ed] up the known plans of abuse in the prison and fail[ed] to remedy or prevent the abuse and risk of ongoing abuse" of which they had knowledge, and are best construed as intentional torts. (Compl. at 28, ¶ 59); *see also Caldwell v. Dep't of Corr.*, 252 A.3d 708 (unpublished table disposition), 2021 WL 1217888 at *3, (Pa. Commw. Ct. 2021) (characterizing prisoner's complaint, which "suggested various conspiracies by Department personnel to cover up evidence of his sexual harassment allegations, to refuse to investigate such allegations, or to have him placed in restricted housing," as "intentional torts").

"Subject to certain exceptions, sovereign immunity shields Commonwealth employees acting within the scope of their duties from liability for tortious conduct." *Justice v. Lombardo*, 208 A.3d 1057, 1059 (Pa. 2019) (citing 1 Pa. Cons. Stat. § 2310; 42 Pa. Cons. Stat. §§ 8521-22). Those exceptions are:  (1) vehicle liability; (2) medical-professional liability; (3) care, custody or control of personal property; (4) Commonwealth real estate, highways and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody and control of animals; (7) liquor store sales; (8) National Guard activities; (9) toxoids and vaccines; and (10) sexual abuse of minors.  42 Pa. Cons. Stat. § 8522(b)(1)-(10).  Immunity is not waived for intentional torts committed by Commonwealth employees; the listed exceptions only apply to negligent conduct.

*Sutton v. Bickell*, 220 A.3d 1027, 1035 (Pa. 2019) (holding that sovereign immunity precluded inmate's conversion claim because it was a "claim of intentional wrongdoing" and "[n]owhere in the Petition is there an averment that the Department acted negligently" such that the conduct "cannot constitute the type of negligent conduct for which the General Assembly has waived its immunity from liability").  "[S]overeign immunity is an affirmative defense" on which a defendant bears the burden of proof.  *Justice*, 208 A.3d at 1068.

The Defendants claim they are entitled to immunity from Zamichieli's state claims because they do not fall within the statutory exceptions to immunity.  (ECF No. 27 at 6-7.) Zamichieli responds by noting that correctional officers do not act within the scope of employment when they assault an inmate.[11]  (ECF No. 29 at 15.)  The Defendants did not file a reply despite being given the opportunity to do so.  (*See* ECF No. 28.)

The Defendants' motion assumes, without analysis, that Defendants Terra, Grady, Patterson, Hensley, Hodrick, Muick, Yodis, and Nyce were acting in the scope of their employment during the events in question.  Although Commonwealth employees are entitled to sovereign immunity for intentional torts, "intentional conduct may fall within, or outside, the scope of a state employee's duties, depending on the circumstances."  *Sutton*, 220 A.3d at 1035. The scope of employment inquiry is "fact-intensive," and may only be decided by the court when "neither the facts nor the inferences to be drawn from them are in dispute."  *Justice*, 208 A.3d at 1060, 1068.

---

[11]    Zamichieli also argues that the moving Defendants are responsible for the safety of prisoners who are in the custody, care, and control of the Department of Corrections.  (*See* ECF No. 29 at 15.)  To the extent he is raising a negligence claim, he does not allege conduct that falls within any of the statutory exceptions to immunity.

"[A] prison guard acts outside the scope of his duties" thereby vitiating immunity "when he or she uses deliberate and unjustified force on an inmate totally divorced from any need of the officer to exert control over the prisoner." *Minor v. Kraynak*, 155 A.3d 114, 124 (Pa. Commw. Ct. 2017) (internal quotations omitted); *see also Justice*, 208 A.3d at 1070 ("[I]t is simply not the law that an employee's use of force is within the scope of employment regardless of whether the force is reasonable or carried out for an improper motive."); *Miller v. Nowakowski*, No. 23-00267, 2025 WL 1938692, at *4 (W.D. Pa. July 14, 2025) ("[C]ourts in this circuit have held that a correctional officer is not acting within the scope of his or her employment, and thus not entitled to the protection of sovereign immunity, when they assault an inmate without justification." (internal quotations omitted) (citing cases)).  The same is true for allegations of sexual abuse.  *See Williamson v. Bolton*, No. 24-2246, 2025 WL 1232624, at *3 (3d Cir. Apr. 29, 2025) (*per curiam*) ("Accepting Williamson's allegations as true and viewing the facts in the light most favorable to him, it is difficult to see how an act of voyeurism by a correctional officer could be within the scope of his employment, given that it is certainly not an authorized action.").  Although Medina and Garnett were the primary actors in this case, the remaining Defendants are alleged to have played a direct role in facilitating the abuse, acting with deliberate indifference to it, and/or aiding and abetting it, as discussed above.  Accordingly, there is a question as to whether they were acting within the scope of their employment for purposes of obtaining sovereign immunity.  Since the Defendants did not address this point, they have not carried their burden of establishing that they are entitled to immunity at this stage of the litigation.  *See, e.g*, *Witters v. Smith*, 736 F. Supp. 3d 238, 249 (M.D. Pa. 2024) ("Courts routinely hold that where excessive force is in question, so too is whether that use of force fell within the scope of the defendant's employment." (internal quotations omitted)).

IV.    **CONCLUSION**

For the following reasons, the Court will: (1) dismiss Zamichieli's retaliation claim based on his filing of a lawsuit against Terra's relative upon the parties' agreement; (2) dismiss Zamichieli's due process claims; and (3) deny the Motion to Dismiss as to all other claims, *i.e.*, Zamichieli's Eighth Amendment claims, retaliation claims based on grievances and PREA complaints, and state law claims. An order follows, which directs the Defendants to respond to the remaining claims in this case.

                              **BY THE COURT:**


                              */s/ Joseph F. Leeson, Jr.*
                              **JOSEPH F. LEESON, JR.**
                              **United States District Judge**